IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

KYLIN NETWORK (BEIJING) MOVIE &   :
CULTURE MEDIA CO, LTD, a Chinese   :
Corporation                                         :
                                                         :
                          Plaintiff,             :
                                                         :     CIVIL CASE NO: _3:16-cv-999-MHL_
BENNETT FIDLOW, an individual,      :
                                                         :
Serve:  Bennett Fidlow                      :
           12415 Seahaven Dr.             :
           Richmond, VA 23233            :     **JURY TRIAL DEMANDED**
                                                         :
SCHRODER FIDLOW, PLC             :
                                                         :
Serve:  Kirk T. Schroder, Registered Agent :
           2310 West Main Street          :
           Suite 108                            :
           Richmond, VA 23220            :
                                                         :
                          Defendants.         :
_____   :

## COMPLAINT

Plaintiff KYLIN NETWORK (BEIJING) MOVIE & CULTURE MEDIA CO, LTD ("Kylin" or "Plaintiff"), by counsel and pursuant to the Rules of this Court, hereby alleges as follows against the defendants Bennett Fidlow ("Fidlow") and the law firm Schroder Fidlow, PLC ("Schroder Fidlow"):

## BACKGROUND

### The Parties

1.      Plaintiff Kylin is, and at all relevant times herein was, a Chinese Corporation with its principal place of business in Beijing, China.

2.      Defendant Fidlow is, and at all relevant times herein was, a domiciliary of the Commonwealth of Virginia. Fidlow is a licensed member of the California Bar and the Virginia

Bar and promotes himself as an "entertainment lawyer" with access to the movie industry.

3.  Defendant Schroder Fidlow is a Virginia professional Limited Liability Company registered and authorized to conduct business in Virginia.  At all relevant times herein, Fedlow was a member of that firm.

4.  Venue and jurisdiction are proper in this court pursuant to 28 USCS § 1391(b) and 28 USCS §1332, respectively.[1]

### Kylin Enters a Partnership With Bliss

4.  In 2014, Kylin entered into a partnership relationship with Bliss Media Limited ("Bliss"), pursuant to which Kylin and Bliss agreed to collaborate on the financing and production of a motion picture ("Birth of the Dragon") about the life of martial artist Bruce Lee ("the Motion Picture").

5.  The terms of the partnership between Kylin and Bliss, which contemplated the joint acquisition by Kylin and Bliss of certain rights in the Motion Picture from its then-current rights holder, were commemorated in a written agreement dated June 1, 2014 (the "Partnership Agreement").  A true and accurate copy of the Partnership Agreement is attached hereto as Exhibit A.

6.  Pursuant to the Partnership Agreement, Bliss promised, *inter alia*, to negotiate with the rights holder of the Picture in order to acquire certain rights for the partnership formed by Kylin and Bliss.

7.  The Partnership Agreement was negotiated, prepared, and drafted on behalf of Bliss by Fidlow.  At the time, Fidlow was the transactional attorney for Bliss (not for Kylin).

### Fidlow Represents Both Kylin & Bliss in the Transaction and Fails to Obtain a Waiver

8.  After Kylin and Bliss entered into the Partnership Agreement, Fidlow undertook

---

[1] This matter was previously filed in the Superior Court for the County of Los Angeles, SC No. 127149, where the matter has been stayed, upon the motion of the defendant Fidlow based upon a venue clause in his engagement agreement designating this Court as the forum for resolving any disputes thereunder.

the joint representation of both parties in their efforts to obtain and secure the rights to the Motion Picture.  The attorney-client relationship between Kylin and Fidlow commenced in or around July 2014. A true and accurate copy of the engagement agreement between Kylin and Fidlow is attached hereto as Exhibit B.

9.     Based on Fidlow's prior representation of only Bliss in the negotiation of the Partnership Agreement, there existed an obvious conflict of interest between Kylin and Bliss. This conflict of interest was heightened by the fact that, under the Partnership Agreement, Kylin and Bliss each had different and competing interests in relation to the Motion Picture.  For example, under the Partnership Agreement and in connection with an anticipated third party co-financing agreement, Kylin and Bliss were to engage in future negotiations between themselves over rights and profit participations arising from the Motion Picture.  Moreover, Bliss and Kylin had agreed to indemnify each other for certain claims arising in connection with the Partnership Agreement, which anticipated the fact that there might be a divergence of interest.

10.     Despite the obvious conflict of interest in simultaneously representing Kylin and Bliss as clients, Fidlow did not disclose the conflict or obtain a conflict waiver from each party prior to commencing his joint representation, as required by Rule 3-310 (C) of the Rules of Professional Conduct of the California State Bar and Rule 1:8 of the Rules of Professional Conduct from the Supreme Court of Virginia.

11.     This failure by Fidlow regarding the conflicts has never been cured.

**Fidlow Breaches His Professional and Fiduciary Duties to Kylin.**

12.     In furtherance of his joint representation of Kylin and Bliss, Fidlow initiated negotiations between Kylin and Bliss, on the one hand, and QED Pictures, LLC ("QED Pictures"), on the other hand, for the purpose of obtaining the rights to the Motion Picture.  Prior to those negotiations, Bliss had located and identified QED Pictures as the purported holder of the rights to the Picture.

13.     However, QED Pictures was <u>not</u> the actual holder of the rights in the Motion Picture.  Rather, two entities – QED Holdings, LLC and QED Writing, LLC – were the true

rights holder.  Those two entities had different ownership than QED Pictures.

14.     During the period of negotiation with QED Pictures and thereafter, Fidlow failed to conduct a diligent and comprehensive review of the Motion Picture's chain of title and/or otherwise confirm that the party that Fidlow was negotiating with on behalf of Kylin – QED Pictures – was in fact the true holder of the rights in the Picture.

15.     At the time of the negotiations, Fidlow actually knew or, alternatively, had constructive knowledge that QED Pictures did not hold the rights which his clients ostensibly purchased.  Indeed, the agreement he negotiated references both (i) an agreement with the author of the magazine article upon which the Motion Pictures screenplay would be based and (ii) an agreement with the screenwriters themselves.  However, QED Pictures, LLC was not a party to either of those critical "chain of title" documents. To the contrary, the agreement with the magazine author was between that author and QED Holdings, LLC, and the agreement with the screenwriters was between them and QED Writing, LLC.

16.     Upon information and belief, Fidlow had copies of these foundational documents. Even if he did not, he had a duty to request, obtain, and review the specific documents referenced in the agreement he was negotiating, as those documents were the very essence of the substantive rights his client was obtaining.  His failure to do so was a breach of the standard of care.

17.     Despite being on notice of the fact that QED Pictures, LLC was not the true holder of the rights to the Motion Picture, Fidlow continued to negotiate a written agreement between Kylin, Bliss, and QED Pictures, LLC, which was executed on August 5, 2014 (the "Financing Agreement"), for the financing and production of the Motion Picture (which QED Pictures, LLC had no rights in).  A true and accurate copy of the Financing Agreement is attached hereto as Exhibit C.

18.     Fidlow advised and then allowed Kylin to enter into the Financing Agreement, pursuant to which Kylin agreed to pay $1.0 million dollars to QED Pictures for certain rights to the Motion Picture that QED Pictures did not own or possess.

19.     Although Fidlow was aware that Kylin's principals (in China) were not fluent in

the English language, he did not make any attempt to have the Financing Agreement translated into Chinese, nor did he ever explain the terms and implications of the Financing Agreement to Kylin, including with respect to the "chain of title" issues described above.  Nor did Fidlow ever provide Kylin with the actual "chain of title" documents for the Motion Picture.

20.     After Kylin executed the Financing Agreement, Fidlow further advised and/or allowed Kylin to pay the $1.0 million to QED Pictures under the Financing Agreement (for certain purported rights to the Motion Picture), as well as another $1.0 million to Bliss under the Partnership Agreement (for Bliss's purported services in helping Kylin to obtain those rights). Each payment was predicated on the bogus premise that QED Pictures had actually conveyed rights in the Motion Picture.

21.     Notably, Fidlow's legal fees for the negotiation of the Financing Agreement were paid solely by Kylin, despite the fact that Fidlow was purporting to represent both Kylin and Bliss in the negotiations.   Prior to accepting this compensation from Kylin, Fidlow never obtained its informed written consent as required by Rule 3-310(F) of the Rules of Professional Conduct of the California State Bar.

**Fidlow's Filing of Two False UCC-1 Financing Statements.**

22.     For months after entering into the Financing Agreement and paying $2.0 million to QED Pictures and Bliss, Kylin was under the impression that it had obtained certain material rights to the Picture from QED Pictures.

23.     However, in late February 2015, Kylin learned <u>for the first time</u> (in conversations with former principals of QED Pictures) that QED Pictures held no rights in the Motion Picture, and that the actual rights holder was a separate entity called QED Holdings, LLC ("QED Holdings").

24.     At this time, QED Pictures agreed to return Kylin's $1.0 million payment so that Kylin, through an affiliate, could enter into a new agreement with the proper rights holder, QED Holdings.  Kylin's affiliate did in fact then enter into a new agreement with QED Holdings, pursuant to which Kylin and its affiliate validly acquired the  rights in the Motion Picture.

25.     However, when Kylin requested the return of its $1.0 million paid to Bliss on the grounds that Bliss had breached its material obligation under the Partnership Agreement to locate and negotiate directly with the actual owner of the Motion Picture, Bliss refused.

26.     On April 2, 2015, Fidlow filed two UCC-1 financing statements (the "UCC-1s") with the California and Delaware Secretaries of State, purportedly on behalf of both Kylin and Bliss.  True and accurate opies of the UCC-1s are attached hereto as Exhibit D.

27.     Despite the fact that Bliss had not actually acquired any rights to the Motion Picture under the Financing Agreement (because there were none), these UCC-1s <u>falsely</u> stated that both Bliss and Kylin had a joint security interest in the Motion Picture.  It also falsely claimed that the security interest was premised on a "copyright assignment" from QED Pictures to Bliss/Kylin.  Of course, there was no such assignment as QED Pictures held no copyright.

28.     The UCC-1s also <u>falsely</u> named QED Holdings, LLC, Sebda Pictures, LLC, and QED Writing, LLC as debtors, despite the fact that neither Bliss nor Kylin had a contract with any of these entities, let alone a security agreement with any of them.

29.     Fidlow's filing of the false UCC-1s also violated California Penal Code section 115, which criminalizes the filing of a public document which the propounding party (i.e. Fidlow) knows to be false at the time of filing.

30.     Although the false UCC-1s were purportedly filed on Kylin's behalf, Fidlow never obtained Kylin's authorization to file the UCC-1s, nor did he disclose the filings to Kylin. If he had contacted them, Kylin would never have authorized such filings, as there was no legal or factual basis to file the UCC-1s. and no benefit to them.

31.     When Kylin's transactional attorney, Ed Labowitz, discovered that the unauthorized UCC-1s had been filed by Fidlow, he demanded that Fidlow immediately withdraw the filings and clear the project of these liens. However, Fidlow refused.  He further refused when the lien release was formally demanded by letter dated July 15, 2015 from Kylin's litigation counsel.  A copy of the July 15, 2015 letter is attached hereto as Exhibit E.

32.     The reason that Fidlow filed the UCC-1s behind Kylin's back and to its detriment

was to favor Bliss in its dispute with Kylin which commenced in early 2015 regarding the $1.0 million paid to Bliss after the bogus QED Pictures transaction.  In addition to harming Kylin's position in that dispute, Fidlow's filing of the UCC-1s also negatively impacted Kylin's development of the Motion Picture, since the false UCC-1s would require Kylin to get Bliss, with which Kylin was then in dispute, to sign off on various agreements involving the Motion Picture thus delaying its production schedule – even after Kylin had validly acquired the rights in 2015.

33.     Had Fidlow believed in good faith that it was necessary to file the UCC-1s, he would have done so immediately after Bliss and Kylin entered into the Financing Agreement (in August 2014), rather than wait until a dispute arose between Bliss and Kylin eight months later. However, he did not act in good faith.

34.     In filing the UCC-1s without Kylin's authorization and in an attempt to gain leverage for Bliss, Fidlow improperly and unlawfully placed the interest of one joint client (Bliss) above the interest of another (Kylin).  He also did so using methods which were not just unlawful, but criminal.

**Fidlow's Attempt to Extort Kylin's Litigation Counsel.**

35.     Based on the above-described misconduct of Fidlow and Bliss, Kylin was forced to obtain litigation counsel, who sent a pre-litigation demand letter to Fidlow dated July 15, 2015.  That letter demanded, inter alia, that Fidlow immediately withdraw the false UCC-1s, which had been filed in bad faith.  See Exhibit E.

36.     On August 22, 2015, in response to the demand from Kylin's litigation counsel, and as a transparent attempt to obtain a benefit for Bliss through a favorable settlement with Kylin, Fidlow improperly threatened in writing that, if Kylin did not drop its allegations regarding the false UCC-1s, Fidlow would file an administrative complaint against Kylin's litigation counsel with the California State Bar.  A copy of Fidlow's email threat of August 22, 2015 is attached hereto as Exhibit F.

37.     This threat on its face was in violation of Penal Code sections 518 et seq. and

Rule 5-100 of the Rules of Professional Conduct of the California State Bar.  It was made with a malicious motive, which was to injure the rights of Kylin in the underlying transaction.

### **Bliss Finally Expunges the False UCC-1s.**

38.    After Kylin filed the California lawsuit referenced in footnote 1 (which has been stayed), naming both Bliss and Fidlow as Defendants, Bliss agreed to expunge the UCC-1s.  The expungement actually occurred on August 18, 2015 and August 19, 2015.

39.    However, by that time, Kylin had already incurred substantial costs, legal fees, and other expenditures attempting to protect its legitimate rights in the Motion Picture – expenditures that would have been completely avoided had Fidlow not engaged in the wrongdoing at issue here.

40.    The relevant actions of Fidlow herein were done intentionally, maliciously and with wanton and willful disregard for the rights of Kylin.

### **COUNT ONE**
### **LEGAL MALPRACTICE**
### **(Kylin Against Both Defendants)**

41.    Kylin incorporates by reference each and every allegation contained in paragraphs 1 through 40, inclusive, as if fully set forth herein.

42.    In or around July 2014, Fidlow and Kylin entered into an attorney client relationship pursuant to which Fidlow was retained to jointly represent Kylin and Bliss in their efforts to obtain and secure the rights to the Picture.

43.    As Kylin's attorney, Fidlow had a duty to exercise reasonable care and skill in undertaking to perform legal services for Kylin.

44.    As alleged, Fidlow breached his duty of care to Kylin by, among other things:

a.    Failing to disclose and/or obtain a conflict waiver from Kylin and Bliss prior to taking on their joint representation;

b.    Failing to obtain Kylin's informed written consent prior to allowing Kylin to pay for legal services rendered to Bliss;

c.    Failing to properly or diligently investigate whether or not QED Pictures legally

held the rights in the Motion Picture;

d.      Advising and allowing Kylin to enter into the Financing Agreement with QED Pictures despite the fact that QED Pictures was not the holder of the rights to the Motion Picture;

e.      Advising and allowing Kylin to pay $1.0 million to QED Pictures for the acquisition of rights in the Motion Picture that QED Pictures did not hold;

f.      Advising and allowing Kylin to pay $1.0 million to Bliss based on the erroneous premise that that Bliss had fulfilled its material obligations under the Partnership Agreement;

g.      Failing to cause the Financing Agreement to be translated into Chinese so that it could be sufficiently reviewed by Kylin;

h.      Failing to sufficiently explain the terms and implications of the Financing Agreement to Kylin;

i.      Filing the false UCC-1s for an improper purpose, against the interests of its clients (Kylin) and in violation of California Penal Code section 115;

j.      Filing the false UCC-1s, purportedly on Kylin's behalf, without Kylin's knowledge and authorization and against its best interests;

k.      Refusing to withdraw the false UCC-1s upon Kylin's demand;

l.      Attempting to extort Kylin's litigation counsel by threatening to file a report with the California State Bar if Kylin did not drop its claims; and

m.      Generally placing the interests of one joint client (Bliss) over the interests of the other joint client (Kylin).

45.     Fidlow's aforesaid breaches of his professional duties have proximately caused damage to Kylin in an amount to be determined at trial but which Kylin is informed and believes is in excess of $1.0 million.  More specifically, Kylin has been deprived of, inter alia, (1) the $1.0 million that it provided to Bliss under the Partnership Agreement, (2) the legal fees that were paid to Fidlow for negligent legal services, and (3) the costs, fees, and other expenses

incurred by Kylin in order to clear the title to the Motion Picture after Fidlow improperly filed the UCC-1s.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY
### (Kylin Against Both Defendants)

46.     Kylin incorporates by reference each and every allegation contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

47.     As Kylin's attorney, Fidlow owed fiduciary duties to Kylin.   These duties included, without limitation, (a) a duty to disclose to Kylin all facts which materially affect Kylin's rights and interests; (b) a duty to inform Kylin of any and all conflicts of interest and to obtain appropriate conflict waivers; (c) a duty to conduct himself with the utmost good faith in all dealings with Kylin; (d) a duty of honesty; (e) a duty of loyalty; and (f) a duty of care.

48.     As alleged, Fidlow breached his duty of care to Kylin by, among other things:

a.      Failing to disclose and/or obtain a conflict waiver from Kylin and Bliss prior to taking on their joint representation;

b.      Failing to obtain Kylin's informed written consent prior to allowing Kylin to pay for legal services rendered to Bliss;

c.      Failing to properly or diligently investigate whether or not QED Pictures legally held the rights in the Motion Picture;

d.      Advising and allowing Kylin to enter into the Financing Agreement with QED Pictures despite the fact that QED Pictures was not the holder of the rights to the Motion Picture;

e.      Advising and allowing Kylin to pay $1.0 million to QED Pictures for the acquisition of rights in the Motion Picture that QED Pictures did not hold;

f.      Advising and allowing Kylin to pay $1.0 million to Bliss based on the erroneous premise that that Bliss had fulfilled its material obligations under the Partnership Agreement;

g.      Failing to cause the Financing Agreement to be translated into Chinese so that it could be sufficiently reviewed by Kylin;

h.      Failing to sufficiently explain the terms and implications of the Financing Agreement to Kylin;

i.      Filing the false UCC-1s for an improper purpose, against the interests of its clients (Kylin) and in violation of California Penal Code section 115;

j.      Filing the false UCC-1s, purportedly on Kylin's behalf, without Kylin's knowledge and authorization and against its best interests;

k.      Refusing to withdraw the false UCC-1s upon Kylin's demand;

l.      Attempting to extort Kylin's litigation counsel by threatening to file a report with the California State Bar if Kylin did not drop its claims; and

m.      Generally placing the interests of one joint client (Bliss) over the interests of the other joint client (Kylin).

49.      Fidlow's aforesaid breaches of his fiduciary duties have proximately caused damage to Kylin in an amount to be determined at trial but which Kylin is informed and believes is in excess of $1.0 million.  More specifically, Kylin has been deprived of, inter alia, (1) the $1 million that it provided to Bliss under the Partnership Agreement, (2) the legal fees that were paid to Fidlow for negligent legal services, and (3) the costs, fees, and other expenses incurred by Kylin in order to clear the title to the Picture after Fidlow improperly filed the UCC-1s.

<u>**COUNT THREE**</u>
**FRAUD**
**(Kylin Against Both Defendants)**

50.      Kylin incorporates by reference each and every allegation contained in paragraphs 1 through 49, inclusive, as if fully set forth herein.

51.      As Kylin's attorney, Fidlow owed fiduciary duties to Kylin, including a duty to disclose to Kylin all facts which materially affect Kylin's rights and interests, a duty of honesty, and a duty of loyalty.

52.     As alleged, on or around August 5, 2014, Fidlow caused Kylin to enter into the Financing Agreement without disclosing the material fact that QED Pictures was not the true holder of the rights to the Picture.   Plaintiff is informed and believes that Fidlow intentionally concealed this material fact from Kylin because Fidlow knew that Kylin would never enter into the Financing Agreement – an agreement to benefit Bliss – if Kylin knew that QED Pictures  was not the true holder of the rights to the Motion Picture.

53.     Had Fidlow disclosed to Kylin that QED Pictures, LLC was not the true holder of the rights to the Picture, Kylin would never have entered into the Financing Agreement.

54.     As further alleged, on or around September 2014, Fidlow caused Kylin to pay $1 million to Bliss under the Partnership Agreement (for Bliss's purported services in helping Kylin to obtain various rights in connection with the Picture) without disclosing to Kylin the material fact that Kylin had not actually obtained rights to the Picture from QED Pictures, LLC.  Fidlow intentionally concealed this fact from Kylin because he knew that Kylin would never pay $1 million to Bliss if Kylin knew that it had not actually obtained any rights to the Picture from QED Pictures, LLC. Kylin did not learn the true facts until February 2015 regarding the movie rights.

55.     Had Fidlow disclosed to Kylin that it had not actually obtained any rights to the Picture from QED Pictures, LLC, Kylin would never have paid $1 million to Bliss.

56.     As further alleged, on April 2, 2015, Fidlow filed the UCC-1s without Kylin's knowledge and authorization, thus intentionally concealing the filings from Kylin.  Fidlow intentionally concealed the filing of the UCC-1s from Kylin because Fidlow knew that Kylin would never have approved the filing, and Fidlow hoped to obtain leverage for Bliss against Kylin in their pending dispute.

57.     Had Fidlow not concealed the filing of the UCC-1s from Kylin, Kylin would never have approved such filings, would have taken affirmative steps to stop the filing, and would have avoided the subsequent expenditure of significant resources to clear title to the Picture.

58.     As a direct and proximate result of Fidlow's fraud, Kylin has been damaged in an amount to be determined at trial.   Among other damages, and in addition to the delay and disruption caused by the filing of the improper UCC-1s, Kylin has been deprived of the $1 million that it was fraudulently induced to provide to Bliss, as well as the monies and resources expended in order to clear title to the Picture.

## PRAYER FOR RELIEF

WHEREFORE, Kylin prays for judgment against Defendants, and each of them, as follows:

1.     Compensatory damages in an amount not less than $1,000,000 in accordance with proof at trial, together with interest thereon at the legal rate;

2.     Punitive damages in the statutory maximum as permitted by law;

3.     For its costs and prejudgment interest as permitted by law;

4.     For its reasonable attorneys fees as may be provided by law; and

5.     For such other and further relief as deemed just and proper.

Respectfully Submitted,
**KYLIN NETWORK (BEIJING) MOVIE & CULTURE Media Co. LTD.**

By:_____/s/_____
                 Counsel

J. Chapman Petersen, VSB # 37225
Stephen P. Pierce, VSB #84999
Surovell Isaacs Petersen & Levy PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
Email: jpetersen@siplfirm.com
          spierce@siplfirm.com
*Counsel for Plaintiff*